United States District Court
Southern District of Texas

**ENTERED**

October 03, 2016

David J. Bradley, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| HILDA ROSE MORGAN, | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. 4:15-CV-02784 |
| | § | |
| CAROLYN W. COLVIN, | § | |
| ACTING COMMISSIONER OF SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| Defendant. | § | |

**MEMORANDUM AND RECOMMENDATION ON
CROSS-MOTIONS FOR SUMMARY JUDGMENT**

This matter was referred by United States District Judge Lee H. Rosenthal, for full pre-trial management, pursuant to 28 U.S.C. § 636(b)(1)(A) and (B). (Docket Entry #3). Cross-motions for summary judgment have been filed by Plaintiff Hilda Rose Morgan ("Plaintiff," "Morgan") and Defendant Carolyn W. Colvin ("Defendant," "Commissioner"), in her capacity as Acting Commissioner of the Social Security Administration ("SSA"). (Plaintiff's Motion for Summary Judgment and Plaintiff's Memorandum in Support of Motion for Summary Judgment [collectively, "Plaintiff's Motion"], Docket Entry #13, 14; Defendant's Cross-Motion for Summary Judgment and Brief in Support of Cross Motion for Summary Judgment ["Defendant's Motion"], Docket Entry #11, 12). Each party has also filed a response to the competing motions. (Plaintiff's Response Memorandum in Support of Motion for Summary Judgment and in Opposition to Defendant's Motion for Summary Judgment ["Plaintiff's Response"], Docket Entry #16; Defendant's Response to Plaintiff's Motion for Summary Judgment ["Defendant's Response"], Docket Entry #15). After considering the pleadings, the evidence submitted, and the applicable law, it is **RECOMMENDED** that Plaintiff's Motion be **GRANTED**, and that Defendant's Motion be **DENIED**.

*Background*

On July 3, 2012, Plaintiff Hilda Rose Morgan filed an application for Supplemental Social Security Income ("SSI") under Title XVI of the Social Security Act ("the Act"). (Transcript ["Tr."] at 197-202). On September 13, 2012, she filed a separate application seeking Disability Insurance Benefits ("DIB") under Title II of the Act. (Tr. at 203-209). In her applications, Plaintiff claimed that she had been unable to work since April 28, 2012, as a result of a learning disability, posttraumatic stress disorder ("PTSD"), depression, anxiety, and obesity. (Tr. at 234). The SSA denied Plaintiff's applications on November 20, 2012, finding that she is not disabled under the Act. (Tr. at 87). Plaintiff petitioned for a reconsideration of that decision. (Tr. at 141). The SSA then had her case independently reviewed, but again denied her benefits, on February 1, 2013. (Tr. at 36).

On March 5, 2013, Plaintiff requested a hearing before an administrative law judge ("ALJ"). (Tr. at 153). That hearing, before ALJ Thomas G. Norman, took place on January 30, 2014. (Tr. at 64-86). Plaintiff appeared with her attorney, Shawn Horox, and she testified in her own behalf. (*Id.*). The ALJ also heard testimony from Dr. Ashok Khushalani[1] ("Dr. Khushalani"), a medical expert, and Joella Sanchez ("Ms. Sanchez"), a vocational expert witness. (*Id.*). At the hearing, Mr. Horox stated that, because of Plaintiff's low I.Q.[2] and her difficulty in understanding and carrying

---

[1] The hearing transcript identifies the witness, phonetically, as Dr. Ashir Kuslani. In his written decision, the ALJ identifies the medical witness as Dr. Ashok Khushalani. The records also identify him as Dr. Ashok Khushalani. (Tr. at 186).

[2] An "I.Q.," or "intelligence quotient," is defined as "a numeric expression of a person's intellectual level as measured against the statistical average of his or her age group." MOSBY'S MEDICAL, NURSING, & ALLIED HEALTH DICTIONARY 1131 (5th ed. 1998).

2

out complex instructions, he believed that she met the criteria for an intellectual disability. (Tr. at 67-68).

Following the hearing, the ALJ engaged in the following five-step, sequential analysis to determine whether Morgan was capable of performing substantial gainful activity or was, in fact, disabled:

1. An individual who is working or engaging in substantial gainful activity will not be found disabled regardless of the medical findings. 20 C.F.R. §§ 404.1520(b) and 416.920(b).

2. An individual who does not have a "severe impairment" will not be found to be disabled. 20 C.F.R. §§ 404.1520(c) and 416.920(c).

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors. 20 C.F.R. §§ 404.1520(d) and 416.920(d).

4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made. 20 C.F.R. §§ 404.1520(e) and 416.920(e).

5. If an individual's impairment precludes performance of his past work, then other factors, including age, education, past work experience, and residual functional capacity must be considered to determine if any work can be performed. 20 C.F.R. §§ 404.1520(f) and 416.920(f).

*Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000); *Martinez v. Chater*, 64 F.3d 172, 173-74 (5th Cir. 1995); *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991); *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991); *Harrell v. Bowen*, 862 F.2d 471, 475 (5th Cir. 1988). It is well-settled that, under this analysis, Morgan has the burden to prove any disability that is relevant to the first four steps. *See Wren*, 925 F.2d at 125. If she is successful, the burden then shifts to the Commissioner, at step five, to show that she is able to perform other work that exists in the national economy. *See Myers*

*v. Apfel*, 238 F.3d 617, 619 (5th Cir. 2001); *Wren*, 925 F.2d at 125.  "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis." *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

It must be emphasized that the mere presence of an impairment does not necessarily establish a disability.  *See Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992) (quoting *Milam v. Bowen*, 782 F.2d 1284, 1286 (5th Cir. 1986)).  An individual seeking SSI benefits under the Act has the burden to prove that she suffers from a disability.  *See Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988); *Cook v. Heckler*, 750 F.2d 391, 393 (5th Cir. 1985).  Under the Act, a claimant is deemed disabled only if she demonstrates an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than twelve months." *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990) (citing 42 U.S.C. § 423(d)(1)(A)). "Substantial gainful activity" is defined as "work activity involving significant physical or mental abilities for pay or profit."  *Newton*, 209 F.3d at 452.  A physical or mental impairment is "an impairment that results from anatomical, physiological or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  *Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983) (citing 42 U.S.C. § 423(d)(3)).  Further, the impairment must be so severe as to limit the claimant so that "she is not only unable to do her previous work but cannot, considering her age, education, and work experience, engage in any kind of substantial gainful work which exists in the national economy." *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994) (citing 42 U.S.C. § 423(d)(2)(A)).

After applying the five step analysis, the ALJ determined that Plaintiff has severe impairments of obesity, borderline intellectual functioning, and depression, but that those impairments, individually or in combination, did not meet or equal a listed impairment. (Tr. at 24). The ALJ found that Morgan has the residual functional capacity to perform light work, but limited to routine, repetitive tasks with low stress, and which require no more than "superficial interaction" with the public, and only occasional interaction with coworkers. (Tr. 29). He also determined that Plaintiff could not perform her past relevant work, but that there are jobs, that are available in significant numbers, that she can perform. (Tr. at 40). He identified some of these jobs, including a housekeeping cleaner, a sales attendant, or a warehouse checker. (Tr. at 40-41). He concluded that Morgan was not disabled, as defined by the Social Security Act, at any time through the date of his decision. (Tr. at 41).

Morgan requested an Appeals Council review of the ALJ's decision. (Tr. at 1). She submitted a brief to the Council, in which she argued that the ALJ should have ordered an updated intelligence examination to determine whether she met Listing 12.05(c) of the Act, which governs "Intellectual Disability." (Tr. at 267-268). She further argued that the ALJ failed to weigh the opinion from a consulting examiner in reaching his determination on her residual functional capacity, and that he failed to support his findings with substantial evidence. (Tr. at 268-270). The Appeals Council can grant a request for a review if any of the following circumstances is present: "(1) there is an apparent abuse of discretion by the ALJ; (2) an error of law has been made; (3) the ALJ's action, findings, or conclusions are not supported by substantial evidence; or (4) there is a broad policy issue which may affect the public interest." 20 C.F.R. §§ 404.970 and 416.1470. On

July 16, 2015, the Appeals Council denied Morgan's request, finding that no applicable reason for review existed. (Tr. at 1-3). With that ruling, the ALJ's findings became final. *See* 20 C.F.R. §§ 404.984(b)(2) and 416.1484(b)(2). On March 22, 2015, Morgan filed this suit, pursuant to section 205(g) of the Act (codified as amended at 42 U.S.C. § 405(g)), to challenge that decision. (Plaintiff's Complaint, Docket Entry #1).

### *Standard of Review*

Federal courts review the Commissioner's denial of disability benefits only to ascertain whether the final decision is supported by substantial evidence and whether the proper legal standards were applied. *See Newton*, 209 F.3d at 452 (citing *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999)). "If the Commissioner's findings are supported by substantial evidence, they must be affirmed." *Id*. (citing *Martinez*, 64 F.3d at 173). "Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. It is more than a mere scintilla and less than a preponderance." *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995); *see Martinez*, 64 F.3d at 173 (quoting *Villa v. Sullivan*, 895 F.2d 1019, 1021-22 (5th Cir. 1990)). On review, the court does not "reweigh the evidence, but . . . only scrutinize[s] the record to determine whether it contains substantial evidence to support the Commissioner's decision." *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995); *see Fraga v. Bowen*, 810 F.2d 1296, 1302 (5th Cir. 1987). In making this determination, the court must weigh the following four factors: the objective medical facts; the diagnoses and opinions from treating physicians on subsidiary questions of fact; Plaintiff's own testimony about her condition; and Plaintiff's educational background, work history, and present age. *See Wren*, 925 F.2d at 126. If no credible evidentiary choices or medical findings exist that

support the Commissioner's decision, then a finding of no substantial evidence is proper.  *See Johnson*, 864 F.2d at 343.

### Discussion

In her motion for summary judgment, Plaintiff contends that the ALJ's determination that her intellectual impairment does not meet or equal the requirements of Listing 12.05(C), the listing which covers intellectual disability, is not supported by substantial evidence.  (Plaintiff's Motion at 1, 11-17).  She argues that the ALJ improperly terminated his analysis on whether she met the requirements of Listing 12.05(c) once he made a decision that the most recent I.Q. test results were not "valid."  (Tr. 11-15).  Plaintiff insists that there was other, credible, evidence that her I.Q. was 70 or less, and there is no evidence that her I.Q. was ever over 70, and so she meets the criteria for the relevant Listing.  (Tr. at 11-16).  For that reason, Plaintiff insists that the ALJ should have completed the analysis, or, alternatively, should have ordered another intelligence examination.  (Tr. at 16).  Plaintiff also argues that the ALJ's finding on her residual functional capacity is not supported by substantial evidence because it does not consider contoverting evidence from Dr. Patricia Johnson.  (Tr. at 17-21).  She insists that the ALJ neglected to weigh the opinion from Dr. Johnson, a consulting examiner.  According to Morgan, Dr. Johnson found that she could not work because of her impairments.  Plaintiff contends that the ALJ provided no explanation for rejecting that opinion, and instead  accepting other, conflicting, evidence on her ability to work.  (Tr. at 18). Morgan is adamant that the ALJ should be directed to consider Dr. Johnson's opinion and to explain the weight, if any, that he ascribes to her opinion.  (Tr. at 21).  Finally, Morgan argues there is not substantial evidence supporting the ALJ's finding that jobs available to her exist in the national or

regional economies.  (Tr. at 21).  Plaintiff argues that the failure to include the limitations described by Dr. Johnson resulted in a faulty hypothetical question to the vocational expert witness.  (Tr. at 21).  Defendant insists, however, that the ALJ properly considered all of the available evidence, and followed the applicable law, in determining that Morgan is not disabled. (Defendant's Motion at 4).

### *Medical Facts, Opinions, and Diagnoses*

The medical evidence available here is quite limited.  Although Morgan was treated at The People's Clinic, for depression, since 2006, she was only able to provide five pages of records which document a single visit with Dr. Asim A. Shah, a psychiatrist with Baylor's Harris Health System/Ben Taub Hospital.  (Tr. at 72, 299-300).  Plaintiff was treated by Dr. Shah for major depression and post-traumatic stress disorder.  (Tr. at 300).  On March 9, 2012, Dr. Shah performed a psychiatric evaluation, which found her normal, and she was reported to have fair insight and judgment, good impulse control, and linear thought processes.  (Tr. at 299).  She was noted to be obese, with a body mass index of 50.[3]  (Tr. at 302).  Dr. Shah reported that Plaintiff was on Prozac, and was stable, with no side effects from the medication.  (Tr. at 299).  Dr. Shah renewed her prescription for Prozac, and told Plaintiff to return for treatment in two months.  (Tr. at 301).  Morgan told Dr. Shah that she was to move her treatment to Dr. Sarah Ramos at the El Franco Lee Clinic,[4] because it was closer to her. (Tr. at 299, 301).

---

[3]  A body mass index ("BMI") of 50 is considered extremely obese.  A normal BMI is 19-24.  BMI chart, available at https://www.nhlbi.nih.gov/health/educational/lose_wt/BMI/bmi_tbl.pdf

[4]  The El Franco Lee Clinic is also part of the Harris Health System.  It appears that Morgan's attorneys did attempt to obtain records from the Harris County Public Health system, but were largely unsuccessful.  (Tr. at 265-266).

The only other medical records that are available document two trips to the emergency room at San Jacinto Methodist Hospital. (Tr. at 317-360). Morgan went to the emergency room on December 4, 2012, complaining of chest pain and a headache. (Tr. at 345). She reported that the symptoms began after she lifted a heavy pot at work. (Tr. at 345). The pain resolved in the emergency room, and she was discharged. (Tr. at 345). Morgan's other visit to the emergency room, at San Jacinto Methodist Hospital, occurred on June 30, 2013. (Tr. at 317). She arrived complaining of stomach and back pain. (Tr. at 317). She was diagnosed with an ovarian cyst and was sent home with pain medication. (Tr. at 320).

### Consultations and Examinations

Morgan has undergone several evaluations in connection with this claim, and a prior claim, for disability benefits. On September 1, 2009, she was examined for an I.Q. Mental Status Report by Carol F. Zuccone ("Ms. Zuccone"), a licensed psychologist acting on behalf of the state. (Tr. at 272). During that examination, Plaintiff reported that she was born in East Baton Rouge, Louisiana, and dropped out of school in the twelfth grade, because she was tired of being teased. (Tr. at 272). She was evacuated to Houston following Hurricane Katrina, and was sheltered at the Reliant Center, with her five children, for one month. (Tr. at 272). Morgan told Ms. Zuccone that she had worked at Walmart, as a stocker, until she was transferred to a position in shipping. (Tr. at 272). Because she was not able to complete the paperwork accurately, she was fired. (Tr. at 272). Ms. Zuccone reported that Plaintiff was extremely obese, disheveled in appearance, and depressed. (Tr. at 273). Morgan was tearful while recounting her experiences during Hurricane Katrina. (Tr. at 273). Her thought processes were coherent, but she could only recall one of three words after five minutes.

9

(Tr. at 273).  She became confused while attempting to recite the alphabet and could not perform

a test which required her to count backward, from one hundred, by threes or sevens.  (Tr. at 273).

She did complete a Comprehensive Test of Nonverbal Intelligence, and received a nonverbal I.Q.

score of 61, a pictorial nonverbal I.Q. score of 64, and a geometric nonverbal I.Q. score of 64.  (Tr.

at 273-274).  Morgan's score placed her in the range of mild mental retardation.  (Tr. at 274).  She

was diagnosed with features of Post Traumatic Stress Disorder and given a GAF score of 55.[5]  (Tr.

at 274).  Ms. Zuccone noted that Plaintiff did not report any limitation in her daily activities, and

was able to care for herself and manage her household.  (Tr. at 274).  Ms. Zuccone believed Plaintiff

had a good prognosis, if she could be employed according to her skill level.  (Tr. at 274).

On April 26, 2011, Morgan was examined for depression by Cecilia Lonnecker, Ph.D, a

psychologist, acting on behalf of the state.  (Tr. at 277).  Dr. Lonnecker found Plaintiff to be a fairly

reliable historian.  (Tr. at 277).  Morgan reported difficulty in sleeping at night, and morning mood

swings.  (Tr. at 277).  At the time of the evaluation, she said that she worked part time at Target, and

was able to live independently.  (Tr. at 278).  Dr. Lonnecker found her thought processes to be

coherent and logical, with no delusions or hallucinations.  (Tr. at 279).  Dr. Lonnecker rated her

intelligence as below average.  (Tr. at 280).  She was diagnosed as having a depressive disorder.

(Tr. 280).  Dr. Lonnecker found her prognosis to be fair, and gave her a GAF score of 65.  (Tr. at

280).  On November 7, 2012, Morgan appeared for a Clinical Interview with Mental Status

---

[5]  The GAF scale is used to rate an individual's "overall psychological functioning." AMERICAN PSYCHIATRIC INSTITUTE, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS ("DSM-IV") 32 (4th ed. 1994). The scale ascribes a numeric range from "1" ("persistent danger of severely hurting self or others") to "100" ("superior functioning") as a way of categorizing a patient's emotional status. *See id.* A GAF score between 41-50 "reflects serious symptoms" or "any serious impairment in social, occupational, or school functioning." *Id.* A GAF score of 51-60 indicates "[m]oderate symptoms (*e.g.*, flat affect and circumstantial speech, occasional panic attacks), or moderate difficulty in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or co-workers)." *Id.*

Examination in connection with the current disability claim.  (Tr. at 286).  Plaintiff was seen by Patricia Johnson, Ph.d, a clinical neuropsychologist acting on behalf of the state.  (Tr. at 286). Morgan reported that her doctor told her to apply for disability due to her depression, PTSD and anxiety.  (Tr. at 286).  Plaintiff explained that she woke up at 5:00 a.m. to get her two daughters ready for school, then returned to bed, where she remained until they returned.  (Tr. at 287).  She cooked and cleaned the house, and said that she was able to pay the bills and shop for groceries.  (Tr. at 287).  The mental status examination showed poor concentration, poor abstract thinking, and a poor result on the Mini Mental Status Exam, due to difficulties in memory and concentration.  (Tr. at 289).  She misspelled the word, "world," but did get three letters correct while spelling it in reverse.  She was given diagnoses of "major depressive disorder," "posttraumatic stress disorder," and "generalized anxiety disorder."  (Tr. at 290).  She received a GAF score of 45.  (Tr. at 290).  Dr. Johnson gave her a "guarded" prognosis, and stressed that she has limited job skills because of her learning disability and limited intellectual functioning.  (Tr. at 290).  Dr. Johnson did not believe Morgan had the ability to reason effectively or make occupational, personal, or social adjustments. (Tr. at 290).

On November 4, 2013, Morgan was examined by David M. McLendon, Ph.D, another psychologist acting on behalf of the state.  (Tr. at 309).  Dr. McLendon completed a Medical Source Statement of Ability to do Work Related Activities.  (Tr. at 306).  Dr. McLendon determined that Morgan had marked limitations in her ability to understand and carry out complex instructions, and to make judgments on complex work-related decisions.  (Tr. at 306).  According to Dr. McLendon, her low intellectual capabilities compromised her capacity to deal with complex situations or make

decisions.  (Tr. at 306).  He further concluded that she had depression which interfered with her social functioning.  (Tr. at 307).

Dr. McLendon also prepared a report following his psychological examination and I.Q. test. (Tr. at 309).  Dr. McLendon described Morgan as a poor historian who appeared to make a conscious effort to cast herself in a negative light.  (Tr. at 309).  He reported that she was co-operative, but did not volunteer information, and gave conflicting information at times. (Tr. at 311). Morgan  was noted to be depressed, but did not have hallucinations or paranoid thinking.  (Tr. at 311).  Plaintiff had an intact ability to reason and to make occupational adjustments, but could not remember Dr. McLendon's name.  (Tr. at 312).  Morgan scored a 61 on the verbal I.Q. test, 62 on the performance I.Q. test, and 58 on the full scale I.Q. test, placing her in the retarded range for each. (Tr. at 312).  However, Dr. McLendon did not think she made a genuine effort to do her best, so he believed her true intellectual ability was better than the scores reflected.  (Tr. at 313).  Dr. McLendon diagnosed mild mental retardation, major depression, and he gave her a GAF score of 54.  (Tr. at 313).  He did not find any indications that she suffered from PTSD.  (Tr. at 314).

### *Educational Background, Work History, and Present Age*

At the time of the hearing, Morgan was 40 years of age.  (Tr. at 272).  She had attended high school through the eleventh-grade.  (Tr. at 272).  She had attended special education classes, beginning in the second grade. (Tr. at 70).  Morgan testified that her work history included a job at Walmart as a cashier and a bagger.  (Tr. at 69).  There is evidence that Plaintiff also worked at

12

Target as a cashier and a fitting room attendant. (Tr. at 69). However, when she was questioned about that job at the hearing, she denied having worked there.[6] (Tr. at 69).

### Subjective Complaints

In her applications for benefits, Plaintiff claimed that she is unable to work because of a learning disability, post-traumatic stress disorder, anxiety, and obesity. (Tr. at 234). She stated that she stopped working on September 1, 2011, when it became impossible for her to complete basic tasks. (Tr. at 235). However, she identified April 28, 2012, as the date on which her disabilities ultimately prevented her from working. (Tr. at 235). She identified only one job, as a cashier, in her work history. In that position, she had to handle money, fold clothes, and clean. (Tr. at 236).

When Plaintiff petitioned for a reconsideration following the initial denial of her claim, she updated her application, and claimed that her PTSD, depression and anxiety had worsened. (Tr. at 248). At that time, she claimed that she typically slept most of the day. (Tr. 250). She identified several daily activities which were affected by her impairments, including driving, cooking, cleaning, and dressing, but she did not explain how those activities were affected by her worsening problems. (Tr. at 250). On January 23, 2013, Morgan submitted a Disability Report Questionnaire. (Tr. at 294). She reported that there was no change in her condition, except that she did not clean or cook as she had done in the past. (Tr. at 294). She identified three locations within the Harris

---

[6] Plaintiff testified before ALJ Rafael Lugo-Vilanova on April 17, 2012, in connection with a prior claim for disability benefits. (See, Tr. at 47-63). At that hearing, Plaintiff testified that she had recently been let go from her part time job at Target. (Tr. at 54). Her depressive disorder impacted that job, because she was frequently late to work, would cry on the job, and could not keep up with her duties. (Tr. at 54-55). She was terminated because she was not able to "keep up" with the workload and was not able to read the online listings for the clothes. (Tr. at 55).

Health System, El Franco Lee Health Center, Valbona Health Center, and Baytown Health Center, where she had received treatment for depression within the prior three months. (Tr. 295-296).

At the hearing before ALJ Thomas Norman on January 30, 2014, Plaintiff explained that the only place she had previously worked was at Walmart, because of its job program for people with disabilities. (Tr. at 70). She testified that she had difficulty reading and doing the math necessary to calculate change as a cashier. (Tr. at 71). Although she handles her own finances, her son helps her balance her checkbook. (Tr. at 71). Morgan was asked what treatment she had received for her depression. (Tr. 72). She explained that she had been treated at The People's Clinic since 2006, and had also been treated at the Methodist Hospital. (Tr. at 72). She testified that she took two medications for depression, but reported no change in her symptoms. (Tr. at 73). She has difficulty in focusing, and is not aware of her surroundings. (Tr. at 74). She does not know the cause of those symptoms, but because of them, she does not believe she could return to work at Walmart. (Tr. at 74).

### *Expert Testimony*

The ALJ also heard testimony from Dr. Ashok Khushalani, a board certified psychiatrist. (Tr. at 75). Dr. Khushalani reviewed the consulting exams that had been completed, but he was not provided any records from prior treatment of Morgan's depression. (Tr. at 75). He briefly summarized the consulting examinations as follows:

> "There are two consultative exams giving a mild mental retardation [diagnosis], one consultative exam did not give any diagnosis, and so – and again in the last consultative the PTSD was not corroborated because the examiner felt that she had absolutely no symptoms of PTSD. So, given the record, I don't know. I don't think the intellectual functioning, particularly since she did work as a cashier at Walmart,

that kind of precludes somebody [with] that retardation.  So, her functioning is probably in the borderline range or low average."

(Tr at 76).  He further testified that,

"[Her] activities of daily living are mildly affected.  Maintaining social functioning is moderately affected.  Maintaining concentration, persistence or pace is moderately affected.  She has not had any episodes of decompensation."

(Tr. at 77).  Dr. Khushalani then referred to Plaintiff's testimony that she was currently taking a medication that was typically used to treat attention deficit hyperactivity disorder.  (Tr. at 76).  He suggested that it was possible that she has a learning disability and attention problems that prevent her from testing accurately.  (Tr. at 76).  According to Dr. Khushalani, this could be the explanation for her low I.Q. scores, rather than actual mental retardation.  (Tr. at 76).  In his opinion, Morgan did not meet the criteria for an intellectual disability or for affective disorders.  (Tr. at 76).

Dr. Khushalani was then questioned by Morgan's attorney.  (Tr. at 77).  Dr. Khushalani agreed that the I.Q. scores from the test administered by Ms. Zuccone in 2009, were "pretty much the same" as the scores from the test administered by Dr. McLendon in 2013.  (Tr. at 78).  But, as Dr. Khushalani pointed out, Dr. McLendon did mention that Plaintiff might not have been trying, so in his opinion, the tests were not comparable.  (Tr. at 78).  Finally, although admitting that he did not know what kind of learning disability Morgan might have, he said that such an impairment could interfere with her intellectual performance.  (Tr. at 79).

The ALJ also heard testimony from Joella Sanchez, a vocational expert.  (Tr. at 376-79).  Ms. Sanchez characterized Morgan's prior work as a cashier as "light," and "unskilled" labor, and said that her prior work as a bagger was "medium" and "unskilled" work.  (Tr. at 80).  The ALJ then

15

posed a hypothetical question to Ms. Sanchez to assess Morgan's ability to find future work:

> Q:     Now, based on her age, education and past work experience, assume I find she can do light work, lifting up to 20 pounds at a time, frequently carrying objects weighing up to 10 pounds, but because of her size, I would put no climbing ladders, ropes or scaffolds.  No working at heights.
>
>          Now on the other side, she can understand, remember and carry out short, simple instructions.  Maintain attention and concentration for extended periods on simple tasks.  Therefore she is limited to routine, repetitive tasks.  Low stress defined as occasional decision making required and occasional changes in work setting.
>
>          She is limited to goal oriented work versus production rate pace work and work requiring no more than superficial interaction and contact with the public.  Occasional interaction and contact with coworkers and supervisors.  Could she do her past relevant work?
>
> A:     No, sir.
>
> Q:     Could you give me three examples of other unskilled work, please?
>
> A.     Such a person could perform the work of a housekeeping cleaner. . . .There are approximately 56,000 jobs in the state of Texas. . . . Such a person could also perform the work of a sales attendant. . . .There are approximately 7,500 jobs in the state of Texas. . . .and such a person could also perform the work of a [warehouse] checker. . . .There are approximately 5,500 jobs in the state of Texas. . . ."

(Tr. at 81-82).  Morgan's attorney then clarified the requirements of the warehouse checker position

in his examination of Ms. Sanchez.  He established that such a position would require her to gather

items identified on a shipping list, and pack them for shipping, with 90 percent accuracy.  (Tr. at 83-

85).

### The ALJ's Decision

Following the hearing, the ALJ made written findings on the evidence.  From his review of

the record, he determined that Morgan suffers from "obesity, borderline intellectual functioning, and

depression," and that those impairments are "severe."  (Tr. at 24).  The ALJ then analyzed whether

16

Plaintiff's impairments were disabling.  He found that Morgan's obesity did not meet or medically equal any listing, because there was no evidence that it impacted her health in a negative way.  (Tr. at 25).  The ALJ next concluded that Morgan had mild limitations in her activities of daily life.  (Tr. at 26).  He found that she had moderate limitations in social functioning and in maintaining concentration, persistence, and pace.  (Tr. at 27).  He found no episodes of decompensation.  (Tr. at 27).  Because he did not find any "marked" restrictions or episodes of decompensation, the ALJ concluded that Plaintiff's depression did not meet or equal the criteria of Listing 12.04 for affective disorders.  (Tr. at 27).  The ALJ then found that Morgan did not meet or equal the Listing criteria for an intellectual disability, because she did not have a valid test showing an I.Q. of 70, or less.  The ALJ dismissed the results of the test conducted by Dr. McLendon, because of his concern about her efforts on the testing.  (Tr. at 28).  The ALJ then determined that Morgan has the residual functional capacity to perform light work, but that she cannot work at heights or climb ladders.  (Tr. at 29). He further determined that she could not perform her past work as a cashier or a bagger, but found that she could work as a housekeeping cleaner, a sales attendant, or a warehouse checker.  He then found that there were a significant number of these jobs available regionally and nationally.  (Tr. at 40-41).  In light of these findings, the ALJ concluded that Plaintiff was "not under a 'disability,' as defined in the Social Security Act, from April 28, 2012, through the date of this decision."  (Tr. at 41).  With that finding, he denied her application for supplemental social security income and for disability insurance benefits.  (Tr. at 42).

It is well settled that judicial review of the Commissioner's decision is limited to a determination of whether it is supported by substantial evidence, and whether the ALJ applied the

proper legal standards in making it.  *See Myers*, 238 F.3d at 619; *Newton*, 209 F.3d at 452 (citing *Brown*, 192 F.3d at 496).  Any conflict in the evidence is to be resolved by the ALJ, and not the court.  *See id*.  A finding of "no substantial evidence" is proper only if there are no credible medical findings or evidentiary choices that support the ALJ's decision.  *See Johnson*, 864 F.2d at 343-44 (quoting *Hames*, 707 F.2d at 164).

### *Disability Listing 12.05*

Plaintiff disputes the ALJ's determination that she did not meet the criteria for Listing 12.05(C) of the Act which details an intellectual disability.  (Plaintiff's Motion at 11-17).  A claimant is deemed to be disabled conclusively if his impairments meet, or equal in severity, an impairment that is listed in the appendix to the Social Security regulations.  *Sullivan v. Zebley,* 493 U.S. 521525 (1990); *Falco v. Shalala*, 27 F.3d 160, 162 (5th Cir. 1994); *Crouchet v. Sullivan*, 885 F.2d 202, 206 (5th Cir. 1989).  Listing 12.05 contains a diagnostic description that provides:

> Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05 (2016).  Listing 12.05 lists four sets of criteria (paragraphs A through D).  *Id*.  "The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied."  *Id*.  Requirement "C," the provision raised by Plaintiff here, is satisfied with evidence of the following:

> A valid verbal, performance, or full scale I.Q. of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function[.]

*Id.*  Plaintiff must separately satisfy both the diagnostic description, requiring evidence of subaverage intellectual functioning during the development period, and the criteria set forth in paragraph C, to be deemed disabled under this provision of the Listing.  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00A (2016); *see also, Randall v. Astrue*, 570 F.3d 651 (5th Cir. 2009).

The Act sets out the manner in which mental disorders, including intellectual disabilities, are to be analyzed.  As part of that analysis, "standardized intelligence test results are ***essential*** to the adjudication ***of all cases*** of intellectual disability that are not covered under the provisions of 12.05A."[7] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00D6b (2016) (emphasis added).  Additionally, "in all cases where more than one I.Q. is customarily derived from the test administered, e.g., where verbal, performance, and full scale I.Q.s are provided in the Wechsler series, we use the lowest of these in conjunction with 12.05."  *Id.* at 12.00D6c.  With these guidelines in place, the ALJ's decision here must be scrutinized.

In this case, the ALJ determined that Plaintiff did not meet the criteria of Listing 12.05.  (Tr. at 28).   The sole reason given was the absence of a valid I.Q. score.  (Tr. at 28).  While he stated that Plaintiff received a full-scale I.Q. score of 58[8] following her examination by Dr. McLendon, the ALJ observed that Dr. McLendon questioned Morgan's level of effort during the testing.  (Tr. at 28).  Because of that concern, the ALJ concluded that the results of Dr. McLendon's testing were not valid.  (Tr. at 28).  In the absence of what he deemed to be a valid I.Q. test in the relevant range, the ALJ decided that the Listing criteria was not met for either 12.05B or 12.05C.  (Tr. at 28).

---

[7] Listing 12.05A requires "mental incapacity evidenced by dependance upon others for personal needs . . . and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded."

[8] An I.Q. score of 58 would, by itself, meet the criteria of Listing 12.05B.

It is true that an ALJ may make factual determinations on the validity of I.Q. tests.  *See,*

*Muse,* 925 F.2d at 790 (citing *Pierre v. Sullivan*, 884 F.2d 799, 803 (5th Cir. 1989)).  For example,

the ALJ may decide not to fully credit the score if there is evidence to show that is unreliable,

invalid, or inconsistent with other evidence in the record. *Cole v. Barnhart*, 69 Fed.Appx. 658 (5th

Cir. 2003). However, "because ALJ's are not physicians they may not hastily reject I.Q. scores."

*Carr v. Astrue*, Civ. No. 1:06cv318-SA-DAS, 2008 WL 4326344, at *4 (N.D. Miss. Sept. 22, 2008).

The decision to accept or reject I.Q. scores must be supported by substantial evidence.  *See, Muse*,

925 F.2d at 790.  In this case, the sole reason the ALJ gave for rejecting the 2012 I.Q. score was Dr.

McLendon's concern over Morgan's level of effort.  (Tr. at 28).  But, this single factor stands in

stark contrast to the rest of the record evidence.  In addition to the I.Q. test, Dr. McLendon also

administered a Wide Range Achievement Test-4.  (Tr. at 313).  Plaintiff's scores fell between the

kindergarten and first grade level in all academic areas that he tested.  (Tr. at 313).  Indeed, Dr.

McLendon agreed that these results were consistent with the outcome of the I.Q. test, but he again

questioned her effort.[9]  (Tr. at 313).  Nonetheless, Dr. McLendon gave Plaintiff a "provisional"

diagnosis of "mild mental retardation, . . . contingent upon corroborating historical supportive

evidence regarding onset during developmental period. . ." (Tr. at 313).  A diagnosis of mild mental

retardation reflects an I.Q. level of "50-55 to approximately 70."  DIAGNOSTIC AND STATISTICAL

MANUAL OF MENTAL DISORDERS, American Psychiatric Society, at 40 (4th Ed. 1994).  In that

regard, Dr. McLendon's own "provisional" diagnosis places Morgan's I.Q. in the same general

range as the actual test results, and so lends support to the validity of the scores themselves.

---

[9]  It must be noted that the concerns about Morgan's level of effort were never substantiated or articulated to any degree.

Further, Morgan was examined by Carol Zuccone, a licensed psychologist, four years earlier in 2009.  (Tr. at 272).  As part of that examination, Plaintiff completed a Comprehensive Test of Nonverbal Intelligence  ("CTONI") I.Q. test with scores of 61, 64 and 64.  (Tr. at 273-274).  These scores are only three points higher than what she received on the test administered by Dr. McLendon,[10] and that score is within the range necessary to satisfy Listing 12.05C.  (Tr. at 274, 312).  Ms. Zuccone also administered the Wide Range Achievement Test revision 3 to Morgan.  The results of that test showed Plaintiff's reading and spelling skills were at a first grade level, and her arithmetic skills were at a second grade level, only slightly higher than Dr. McLendon's results.  (Tr. at 274).  Dr. Khushalani, at the hearing, agreed that the test scores from Ms. Zuccone's examination and the test scores from Dr. McLendon's examination were fairly consistent.  (Tr. at 78).  There is no suggestion by the ALJ, or anyone else, that the results of the 2009 test were not valid due to a lack of effort on Morgan's part.  Instead, Dr. Khushalani admitted at the hearing that it was safe to assume that the test scores from Ms. Zuccone's examination were, indeed, accurate.  (Tr. at 77-78).  There is no contention that the test scores from 2009 are unreliable because they are too old.  In fact, "there is a presumption that I.Q. remains stable over time."  *Adams v. Astrue*, 2011 WL 2550772 at *3 (N.D. Tex. June 27, 2011).  There is no indication that the test format used by Ms. Zuccone is invalid.  Instead, the Act contemplates the use of this type of I.Q. test in certain circumstances.  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00D6d (2016).[11]  Moreover, Ms. Zuccone and Dr. McLendon

---

[10]   The record does not contain the confidence interval or standard of error for either I.Q. test.   Such information could show if the difference in scores is statistically meaningful or if the results are essentially the same.

[11]   "[I]n special circumstances, such as the assessment of individuals with sensory, motor, or communication abnormalities. . . measures such as the Test of Nonverbal Intelligence, Third Edition (TONI-3) . . . may be used."  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00D6d (2016).  Ms. Zuccone explained, "This nonverbal measure was chosen given [Plaintiff's] history of learning disability and special education."  (Tr. at 274).

reached the same diagnosis of mild mental retardation, and gave Plaintiff nearly identical GAF scores (55 and 54).  (Tr. at 274, 313).  Such similarities tend to confirm the results of Dr. McLendon's test, not render them invalid.  In light of this evidence, it cannot be said that the ALJ's decision to reject the scores from Dr. McLendon's I.Q. test is supported by substantial evidence.

Equally troubling, after deciding that the I.Q. test scores from 2013, were invalid, the ALJ ended his inquiry on whether Plaintiff's condition met the criteria for Listing 12.05.  (Tr. at 28).  As noted earlier, even had the 2013 test results been invalid, there was still evidence that Plaintiff's I.Q. scores met the criteria of Listing 12.05.  In his twenty-one page decision, the ALJ made only a single reference to the scores from the testing administered by Ms. Zuccone.[12]  (Tr. at 38).  However, he did not consider those results as part of his 12.05 Listing analysis, and he offered no explanation for his decision to ignore them.  While the ALJ may have had a legitimate reason to reject those scores from the 2009 I.Q. test, he must explain that reason and support it with substantial evidence.  *Muse*, 925 F.2d at 790.

In addition to the fact that the results from both I.Q. tests suggest Plaintiff's I.Q. is sufficiently low to meet the criteria for Listing 12.05, there is other evidence to support the conclusion that Morgan's I.Q. is 70 or below.  Plaintiff's performance on the Wide Range Achievement Tests, with scores ranging from kindergarten to second-grade level performance, is consistent with a diagnosis of mild mental retardation.  *See, Durden v. Astru*, 586 F.Supp.2d 828, 836 (S.D. Tex. 2008) (noting that individuals with mild mental retardation may acquire academic

---

[12]  The ALJ wrote, "Despite the claimant's I.Q. scores (from 2009 and 2013) that apparently indicated a mild level of retardation, and despite Dr. McLendon's opinion that the claimant did not put forth good effort (at least in the latter testing), given the claimant's employment history and her own acknowledgments of her abilities (i.e. the ability to drive, care for her children, handle her finances, etc.), the undersigned finds that the claimant can handle the above residual functional capacity assessment."  This is the only acknowledgment of that test or Ms. Zuccone.

skills up to a sixth-grade level). Although Dr. McLendon questioned her effort on this test, Ms. Zuccone did not. Consistent with her educational achievements, Plaintiff needs the assistance of her son to help her pay bills and balance the checkbook. She also struggled with making correct change when she was a cashier, and was ultimately terminated for failing to keep up with her work duties. (Tr. at 29). Dr. Johnson found that Plaintiff had difficulty with memory and concentration, and she did not believe Morgan had the ability to reason effectively or to make occupational, personal, or social adjustments. (Tr. at 290). This is also consistent with a diagnosis of mild mental retardation. *See generally, Durden*, 586 F.Supp.2d at 836.

In this case, the ALJ ruled on the merits of a claim for an intellectual disability without the benefit of an intelligence test, an essential component of the adjudication process. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00D6b (2016). The ALJ was placed in that position by his decisions to reject the 2013 test result, to ignore the 2009 test result, and not to request another examination. While each of those decisions may be separately defensible, when joined, in this case, it left the ALJ with no I.Q. scores to utilize in his assessment. The SSA regulations provide that additional examinations "may be ordered when the evidence as a whole, both medical and nonmedical, is not sufficient to support a decision on a claim." 20 C.F.R. § 404.919(a); *see Turner v. Califano*, 563 F.2d 669, 671 (5th Cir. 1977) (quoting *McGee v. Weinberger*, 518 F.2d 330, 332 (5th Cir. 1975)). While the decision to require additional tests is discretionary, the ALJ must also follow the requirements of the SSA regulations. *See generally, Anderson v. Sullivan*, 887 F.2d 630, 634 (5th Cir.1989) (holding that the decision to order a consultative exam is within the discretion of the ALJ), and *Morton v. Ruiz*, 415 U.S. 199, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974)(stating that "where the rights of individuals are affected, an agency must follow its own procedure"). The SSA considers an

23

intelligence test to be an essential part of the adjudication of all intellectual disability claims.  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00D6b.  The ALJ's decision not to request another I.Q. test, after invalidating the results of one test and ignoring the results of another, is inexplicable in light of the clear presumption in the regulations that one is necessary to adjudicate this claim.  Considering the evidence in its entirety, it is clear the ALJ's adjudication of Morgan's intellectual disability claim without a valid I.Q. test, and his resulting decision she is not disabled under Listing 12.05, is not supported by substantial evidence.

### *Residual Functional Capacity Determination*

Morgan's alternative complaint is that the ALJ erred in assessing her residual functional capacity.  (Plaintiff's Motion at 17).  The ALJ found that Plaintiff has the residual functional capacity to perform light work light,[13] but that she could not climb ladders or work at heights, and was limited to routine, repetitive, goal oriented work, and to "superficial interaction" with the public, and only occasional interaction with co-workers and supervisors.  (Tr. at 29).  Plaintiff argues that, in reaching this conclusion, the "ALJ failed to weigh the disabling opinion from consultative examiner Dr. [Patricia] Johnson."  (Plaintiff's Motion at 18-19).  Plaintiff argues, in particular, that Dr. Johnson's opinions that she had "limited job skills" and did not appear "to have the ability to reason effectively or to make occupational, personal or social adjustments" should have been considered by the ALJ.  (Plaintiff's Motion at 18).  Plaintiff contends that the ALJ "forgot to weigh Dr. Johnson's opinion entirely."  (*Id.*).

---

[13] "Light work" is "work which requires maximum lifting of twenty pounds and frequent lifting of ten pounds." *Waters v. Barnhart*, 276 F.3d 716, 718 (5th Cir. 2002).

In the absence of a controlling opinion from a treating doctor, "the administrative law judge must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant." 20 C.F.R. §§ 404.1527(e)(2)(ii). The ALJ spent two pages summarizing the evaluation done by Dr. Johnson and her resulting opinions. (Tr. at 30-31). However, his discussion does not explain the weight, if any, that he gave to those opinions. (Tr. at 30-31). In contrast, the ALJ "afford[ed] Dr. McLendon's opinion great weight, as it is supported by the evidence of record. . . ." (Tr. at 34). The ALJ also expressly gave some weight to the opinions from two state agency examiners who completed residual functional capacity reports, and to Dr. Kushalani, the testifying expert witness. (Tr. at 35). The ALJ erred in failing to articulate an explanation for the weight, if any, given to the opinions expressed by Dr. Johnson. *See,* 20 C.F.R. § 404.1527(e)(2)(ii); *Hammond v. Barnhart*, 124 Fed. Appx. 847, 851 (5th Cir. 2005).

### Conclusion

It is true that Plaintiff's claim cannot succeed unless she shows that she was prejudiced by the ALJ's failure, in the case. *See Hall v. Schweiker*, 660 F.2d 116, 119 (5th Cir. 1981). As the Fifth Circuit has explained, "where the rights of individuals are affected, an agency must follow its own procedures, even where the internal procedures are more rigorous than otherwise would be required." *Newton*, 209 F.3d at 459 (quoting *Hall*, 660 F.2d at 119 (5th Cir. 1981)). "If prejudice results from the violation, the result cannot stand." *Id*. In social security cases, a claimant establishes prejudice by showing that, absent the error, the ALJ might have reached a different conclusion. *See id.* at 453; *Ripley*, 67 F. 3d at 557 n.22. If any one of the errors identified above caused prejudice, this matter must be remanded. *Id.*

In this case, there can be no doubt that a different result might have been reached had the ALJ completed his analysis of Listing 12.05 with the benefit of the results of an I.Q. test, as contemplated by the Act.  A valid I.Q. test would have allowed the ALJ to complete the Listing 12.05 analysis, which could result in a finding that Plaintiff is disabled.  Because the ALJ's error in handling the evaluation of the Listing 12.05 requires remand, it is not necessary to decided whether the error in failing to explain the weight given to Dr. Johnson's opinion was prejudicial.  Similarly, the court need not address Plaintiff's other contention that the ALJ's "step five" determination is not supported by substantial evidence.  (Tr. at 21-22).   On this record, the ALJ's determination that Morgan is not disabled, and his consequent denial of SSA benefits, cannot be said to be supported by substantial evidence.   Given these circumstances, the court recommends that the ALJ's decision to deny Plaintiff's application for SSI benefits be remanded for further consideration of Listing 12.05, and the weight to be given to Dr. Johnson's opinions.

Based on the foregoing, it is **RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **GRANTED**, and that Defendant's Motion for Summary Judgment be **DENIED**.

The Clerk of the Court shall send copies of the Memorandum and Recommendation to the respective parties, who will then have fourteen days to file written objections, pursuant to 28 U.S.C. § 636(b)(1)(c), General Order 02-13, S.D. Texas.  Failure to file written objections within the time period provided will bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk, P.O. Box 61010, Houston, Texas, 77208; copies of any such objections shall be delivered to the

chambers of Judge Lee H. Rosenthal, Room 11535, and to the chambers of the undersigned, Room 7007.

**SIGNED** at Houston, Texas, this 3rd day of October, 2016.

**MARY MILLOY**
**UNITED STATES MAGISTRATE JUDGE**